UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN JEWISH COMMITTEE,<br><br>                              Plaintiff,<br><br>                     v.<br><br>JAY BERMAN and TIME & SPACE MEDIA, INC.,<br><br>                              Defendants. | 15 Civ. _____<br><br>JURY TRIAL DEMANDED<br><br>**COMPLAINT** |

Plaintiff American Jewish Committee ("AJC"), by and through its undersigned attorneys, for its Complaint against Jay Berman ("Berman") and Time & Space Media, Inc. ("TSM") (collectively, "Defendants"), hereby alleges and states as follows:

**NATURE OF THIS ACTION**

1.      This action arises from Defendants' fraudulent scheme to misappropriate monies from AJC—a nonprofit entity that has for over a century served as one of the leading global Jewish advocacy organizations.

2.      Under the guise of providing media buying services for advocacy spots that were to run on certain radio programs, Berman—acting through TSM—accepted advanced payments from AJC for the express purpose of timely disbursing those funds to media vendors.  Rather than remitting those payments to a media vendor, as contractually mandated under the parties' agreement, Berman  instead surreptitiously retained AJC's payments totaling approximately $350,000.

3.      Through his acts and omissions Berman has used his "media management company" systematically to divert his client's funds for his own personal benefit and enrichment. As a result of Defendants' conduct described below, AJC has suffered substantial damages for

which it now seeks this Court's relief.  AJC is not the first organization that has been victimized

by Berman in this manner; after his most recent defalcations were uncovered, AJC learned that

Berman, acting through another (now defunct) entity engaged in the same misconduct, pocketing

funds from at least one other client rather than remitting them to other media vendors.  Thus, it is

beyond question that Berman knew exactly what he was doing when he engaged in the gross

misconduct giving rise to this action.

## PARTIES

4.      Plaintiff AJC is a New York not-for-profit corporation that maintains its principal

place of business at 165 East 56th Street, New York, New York 10022.

5.      Defendant Berman is a citizen of the State of Illinois and is the President of

Defendant TSM.

6.      Defendant TSM is an Illinois corporation with its principal place of business

located at 5 Revere Drive, Suite 200, Northbrook, Illinois 60062.  At all relevant times Berman

acted on behalf of TSM.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C.

§ 1332(a)(1) because the parties are citizens of different states and the amount in controversy is

greater than $75,000.

8.      This Court has personal jurisdiction over Berman and TSM under N.Y. C.P.L.R §

302 because Defendants (i) transacted business within the State of New York and contracted to

supply services in the state; (ii) committed tortious acts within the state; and (iii) committed a

tortious act without the state causing injury to person or property within the state, and they

regularly do or solicit business, or engage in other persistent course of conduct, or derive

substantial revenue from services rendered, in the state, and expect or should reasonably expect

their acts to have consequences in the state and derive substantial revenue from interstate or international commerce.

9.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district.

## GENERAL FACTUAL ALLEGATIONS

### A.     AJC Contracted With Defendants for Media Buying Services

10.     AJC maintains its national office in New York City and has 22 regional offices across the United States.  AJC also maintains multiple offices around the globe, including regional institutes that cover Africa, Asia and Latin America and formal partnerships with international Jewish communities.  For more than a century, AJC's mission has been to work as a global advocate to enhance the peace and security of Israel and the Jewish people, and to advance human rights and democratic values in the United States and worldwide.

11.     Through a global media presence, AJC generates awareness and provides expert resources to promote its advocacy agenda.

12.     Upon information and belief, Berman is the sole owner of TSM and at all relevant times has served as TSM's President.  TSM promotes itself as "a full service media management company."  On its website (www.timeandspacemediabuying.com), TSM describes its services as follows:

**Media Planning**
Once the client determines what their media spend is, we work to put together a media plan.  We will research the market, costs, demographics, male or female, adults, mediums to use.  Combining several mediums is optimum to garner the most reach and frequency.  We will give the client multiple options to choose from along with our recommendation.

**Media Negotiations**
We negotiate the best possible prices of media schedules by alerting the marketplace (RFP).  The reps then submit media schedules.  We will go at least 2x-3x rounds of negotiations on behalf of the client to get the "most

bang for their buck".  All negotiations include added value.  These can be additional no charge spots, news, traffic or weather sponsorships in radio. Screen logos of the client on TV to website click thru to the clients web site.  Creating an on air feature, (play of the game brought to you by...) additional live reads etc.

### Media Placement

Once the client approves our media buy, we will place the orders with the media vendors & make sure that the order is placed as agreed.

### Buy Stewardship

During the flight or running of the media schedule, we will be in constant contact with our media reps to make sure things are running smoothly. We will check to see if we can "upgrade" our schedules if there is unsold inventory.  Request broadcast spot times per client request, so they can inform their own key employees, suppliers or clients.

### Invoice Reconciliation

After media schedules run or if running over multiple months, we check all vendor invoices to insure what we ordered is what ran.  This is a critical step in the process.  If we find any discrepancies, we will ask for make goods (no charge spots) or a credit, depending on what the client wants.  We will, at the time of placement, ask for no competitors spots to run in the same commercial break.  This process is handled by the buyer who did the buy as we make our buyers accountable for our clients spend. Once approval is given, invoices are initialed for payment.

### Media Bill Paying

The client can send us one check with the media costs plus our negotiated fee.  ***After receipt of their check, we will pay all the media vendors so the client doesn't need to do any "back end" work***.

(Emphasis supplied.)

13.    In or about November 2013, AJC retained TSM to purchase certain radio media advocacy time beginning in January 2014.  In exchange for payments received from AJC, TSM was to handle all aspects of the placement of that radio media time.  In particular, TSM was to place time with Westwood One ("Westwood One"), one of the largest radio networks in the United States, as well as individual spots in markets that Westwood One did not service.  The media time was scheduled to be aired during "The Osgood Files" radio program with Charles

Osgood.  All invoices for this radio time were to be sent directly to TSM for reconciliation and TSM was to pay the media vendors directly using the funds advanced to it by AJC, which TSM received a fee for doing so.

**B.**     **Defendants' Media Buys With Westwood One**

14.     Pursuant to the parties' agreement, throughout 2014 and continuing well into 2015, TSM contracted directly with Westwood One to purchase radio spots.  TSM periodically invoiced AJC for both media costs and TSM's fees in connection with those spots.

15.     By email dated November 20, 2014, Berman represented to AJC that TSM's media spend on Westwood One "is the lowest unit rate of any advertising in the country." Berman further represented to AJC in that same email that Westwood One would only honor these below market rates if they were purchased directly through TSM and paid for months in advance.

16.     AJC timely paid TSM's invoices with the full expectation that the funds advanced to TSM would in turn be used to pay Westwood One's invoices, which were sent directly to TSM.

**C.**     **Defendants' Unlawful Retention of AJC's Payments**

17.     Despite the ongoing representations made to AJC by Berman that TSM was handling the payments due to Westwood One, Defendants were merely invoicing AJC for media purchased through Westwood One and retaining AJC's payments for their own benefit.

18.     Since June 2014, TSM has issued to AJC—and AJC has promptly paid in full— the following invoices for costs and fees that were purportedly due in advance to purchase media buys through Westwood One:

| TSM Invoice No. | Invoice Date | Air Dates Scheduled on Westwood One | Net Amount Due for Westwood One Spots |
|---|---|---|---|
| AJC008 | June 11, 2014 | Sept.-Oct. 2014 | $90,000.00 |
| AJC009 | July 16, 2014 | Nov.-Dec. 2014 | $80,000.00 |
| AJC010 | Aug. 8, 2014 | Aug. 2014 (additional spend) | $36,260.00 |
| AJC011 | Oct. 30, 2014 | Jan.-Feb. 2015 | $91,936.66 |
| AJC012 | Nov. 17, 2014 | March-April 2015 | $91,936.66 |
| AJC014 | Feb. 2, 2015 | May-June 2015 | $81,721.47 |
| AJC015 | May 5, 2015 | July-Oct. 2015 | $91,936.65 |
| AJC016 | June 28, 2015 | Nov.-Dec. 2015 | $81,721.46 |
| **TOTAL:** | | | **$645,512.90** |

19.     However, these invoices, and the representations in them that they were for advance payment of Westwood One's invoices, were false.  On or about July 15, 2015, AJC was informed by a representative from Westwood One that that TSM had failed to pay the vast majority of Westwood One's outstanding balance.  Westwood One claimed that the due and outstanding balance for all of the media purchases for AJC was $351,280, broken down as follows:

| Westwood One Invoice No. | Invoice Date | Air Dates on Westwood One | Net Amount Due |
|---|---|---|---|
| 139637 | Oct. 26, 2014 | Oct. 2014 | $17,400.00 |
| 140446 | Nov. 30, 2014 | Oct.-Nov. 2014 | $46,750.00 |
| 141177 | Dec. 28, 2014 | Dec. 2014 | $37,400.00 |
| 141750 | Jan. 25, 2015 | Jan. 2015 | $38,420.00 |
| 142371 | Feb. 22, 2015 | Jan.-Feb. 2015 | $38,420.00 |
| 143046 | March 29, 2015 | Feb.-March 2015 | $48,025.00 |
| 143648 | April 26, 2015 | April 2015 | $38,420.00 |
| 144304 | May 31, 2015 | May 2015 | $48,025.00 |
| 144898 | June 28, 2015 | June 2015 | $38,420.00 |
| **TOTAL:** | | | **$351,280.00** |

20.     All of those amounts had, in fact, been paid to Defendants by AJC pursuant to the parties' agreement, with the understanding that Defendants would disburse those amounts over to Westwood One, which Defendants knowingly failed to do.  Indeed, as the above chart shows, Defendants invoiced AJC for *future* spots, when they had in fact not remitted payment for *past* ones. Thus, Defendants were knowingly submitting false and fraudulent billings to AJC.

21.     Westwood One further notified AJC that, when its representative contacted Berman about these outstanding amounts, Berman stated that they had not been paid because AJC had not paid TSM.  This was a knowingly false statement.  Indeed, by email dated November 21, 2014, Berman confirmed to AJC's General Counsel that "[n]ot once have I mentioned that AJC has ever been late in payments.  As a matter of fact, AJC is one of our best on time paying clients, which is greatly appreciated."

22.     In fact, on a number of occasions during 2015, Berman specifically inquired regarding the status of payments, and asked AJC that those payments be expedited by paying by wire transfer rather than mailed check.  As an accommodation, AJC complied with these requests.  For example, on February 1, 2015, Berman emailed AJC and advised that he had not received that month's check, and requested a wire transfer.  AJC complied and on February 12, 2015, Berman emailed AJC to acknowledge that he received the wired funds.

23.     Accordingly, Berman's false statement to Westwood One that AJC had not remitted payment to Defendants shows that Defendants were knowingly retaining AJC's funds for their own purposes rather than paying them over to Westwood One, as Berman knew Defendants were required to do.

**D.**   <u>**Berman's History of Misconduct**</u>

24.     As noted, after it learned that Berman and TSM had failed to pay Westwood One amounts AJC had paid to Defendants, AJC also learned that Berman previously engaged in precisely the same type of misconduct demonstrated here with other media buying clients.

25.     Prior to incorporating TSM in 2006, Berman operated another media buying services firm named Berman and Associates, Inc. ("B&A"), located at the same address as TSM (5 Revere Drive, Northbrook, Illinois).  As with TSM, B&A was incorporated in Illinois by Berman and he was its principal and President until B&A ceased operations in 2006.

26.     On August 9, 2006, one of B&A's media buying clients, Follett Higher Education Group, Inc. ("Follett"), filed a lawsuit against B&A and Berman individually in Illinois state court, alleging that on numerous occasions B&A failed to pay media outlets for Follett's advertising placements.  More specifically, Follett alleged the following:

> B & A began to experience a financial downturn and struggled to remain operating . . . . Jay Berman admitted that there were "hundreds of thousands of dollars' worth of bills" that Follett gave him the money to pay, but that remained unpaid.  He also acknowledged that B & A "commingled" the money of all of its clients, as well as B & A's own money, in a single account.  Ultimately, B & A closed its doors in the summer of 2006 and dissolved as an Illinois corporation in December 2006.

*Follett Higher Educ. Group, Inc. v. Berman*, Memorandum and Opinion and Order on Appeal, Bankr. No. 06 B 10566, Adversary No. 07-141 (N.D. Ill. Mar. 29, 2010) [Dkt. No. 13].

27.     On August 23, 2006, Berman filed a Chapter 7 bankruptcy petition in the Northern District of Illinois, and listed debts incurred by B&A—including the debt owed to Follett—on his schedule of outstanding debts.  (Follett voluntarily dismissed the Illinois state court action on November 11, 2007.)

28.     It is readily apparent that Berman is using TSM in the same improper manner that he used B&A—and his recidivist misconduct shows that the wrongdoing here is knowing and intentional, rather than part of any innocent business downturn.  Here, as with his prior business entity, Berman accepted hundreds of thousands of dollars from his client as purported advances that he would distribute to vendors for media buys when in fact he was simply pocketing these funds for his own self-serving benefit and enrichment.  As a result of Defendants' conduct described herein, AJC has been damaged in the amount of at least $351,280.

**COUNT ONE**
**AGAINST TSM**

**Breach of Contract**

29.     AJC repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth fully herein.

30.     AJC and TSM entered into a contract whereby TSM would purchase both spot and network radio media buys for AJC using funds advanced to TSM by AJC.

31.     Under the parties' agreement, all invoices from AJC's media vendors were to be sent directly to TSM for reconciliation.  TSM was obligated to promptly  pay any such media vendor directly using the funds advanced to it by AJC.

32.     AJC performed its obligations under the parties' agreement and timely paid TSM for all invoiced amounts due for the radio media buys.

33.     Rather than paying the invoices it received from Westwood One, as it was required to do under the parties' agreement, TSM simply retained multiple months' worth of advances from AJC in direct breach of the parties' agreement.

34.     AJC has suffered injury as a direct and proximate cause of TSM's unlawful actions, including but not limited to a loss of not less than $351,280.  As a result of the conduct alleged herein, TSM is liable to AJC.

## COUNT TWO
## AGAINST TSM AND BERMAN

### Fraud

35.     AJC repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth fully herein.

36.     Through his actions and words, Berman, acting on behalf of TSM, represented to AJC on multiple occasions that TSM would pay all of AJC's media vendors, including Westwood One, for AJC's radio media buys using funds advanced to TSM specifically for that purpose.

37.     At least since October 2014, Berman knew or recklessly disregarded the fact that TSM would not pay for some or all of the media buys he purchased through Westwood One on AJC's behalf.

38.     On information and belief, Berman's acts and omissions, as alleged above, were perpetrated intentionally, in bad faith and with willful and wanton dishonesty, with the intent to take from AJC funds that were specifically for the payment to Westwood One for radio media buys purportedly made on AJC's behalf.

39.     As described above, on multiple occasions, Berman made express or implicit representations to AJC that he knew or should have known to be false, with the intent of inducing AJC to enter into one or more agreements with TSM and inducing AJC to advance him substantial funds for the purported purpose of promptly paying AJC's media vendors, including Westwood One.

40.     AJC reasonably relied on the aforesaid representations made by Berman.

41.     As set forth above, AJC has been damaged by its reliance on the false statements made by Berman.

42.     AJC has suffered injury as a direct and proximate cause of Defendants' unlawful actions, including but not limited to a loss of not less than $351,280.  As a result of the conduct alleged herein, Defendants are liable to AJC.

**COUNT THREE**
**AGAINST TSM AND BERMAN**

**Breach of Fiduciary Duty**

43.     AJC repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth fully herein.

44.     By virtue of the special and ongoing business dealings among the parties, TSM and Berman owed a fiduciary duty to AJC.  As a result of their fiduciary relationships, Defendants owed AJC the highest obligation of good faith, fair dealing, loyalty and due care.

45.     A relationship of higher trust was established between Defendants and AJC that extended well beyond the parties' mere contractual obligations.  Over the course of multiple years, Defendants undertook to provide AJC with comprehensive media buying services encompassing media planning, media negotiations, media placement, media stewardship, invoice reconciliation and the payment of all media invoices.

46.     AJC relied upon Defendants to negotiate favorable radio media purchases on its behalf in both the local "spot" markets and the broader "network" markets.  As a nonprofit entity, AJC was especially reliant on Defendants' ongoing promises that they were diligently working on AJC's behalf to secure the most competitive media pricing in the marketplace. Based on Defendants' representations to AJC, AJC made numerous payments to TSM in 2014

and 2015 in reliance on Defendants' insistence that such payments, which at the time were supposedly being made in advance, were necessary to secure the best rates with Westwood One and other media vendors.  Berman informed AJC by email dated November 20, 2014 that that only way TSM could "secure below market pricing" for AJC's nationwide radio coverage was for AJC to purchase the spots directly through TSM and furnish Defendants with substantial then-advanced payments, which in turn Defendants promised to promptly disburse to AJC's media vendors to lock in such favorable rates.

47.    Defendants breached their fiduciary duties to AJC in numerous ways, including but not limited to (a) accepting advanced payments from AJC specifically designated for its radio media vendors and retaining those advanced payments for Defendants' own benefit and enrichment; (b) falsely informing Westwood One that AJC itself was responsible for late payments and unpaid invoices; (c) refusing to inform AJC about outstanding invoices due to Westwood One spanning a period of several months; and (d) harming AJC's years of relations with Westwood One and the media marketplace in general.

48.    As a result of Defendants' breaches of the fiduciary duties owed to AJC, AJC has been damaged in an amount to be determined at trial.

## COUNT FOUR
## AGAINST TSM AND BERMAN

### Conversion

49.    AJC repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth fully herein.

51.    AJC has a possessory right over the $351,280 it advanced Defendants for media purchases through Westwood One, a sum which is identifiable and specific, which AJC remitted to Defendants in return for services that were never rendered.

52.     Defendants have improperly exercised dominion and control over the identifiable sum of $351,280 properly belonging to AJC.

53.     As a result of Defendants' conversion of the sum of $351,280, AJC has been injured in an amount to be determined at trial but in no event less than $351,280, plus related costs, interest, and fees.

54.     Equity and good conscience requires full restitution of the monies received by Defendants from AJC for the intended payment of AJC's media buys through Westwood One. Those monies amount to not less than $351,280, for which AJC should have judgment.

## COUNT FIVE
## AGAINST TSM AND BERMAN

### Unjust Enrichment

55.     AJC repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth fully herein.

56.     Defendants have unjustly benefited through the receipt of money from AJC in the form of advanced payments for radio media buys intended to be disbursed by Defendants to Westwood One.  These funds were the property of AJC for which Defendants did not adequately compensate AJC or provide value; Defendants acquired these funds only as result of perpetuating and participating in a scheme to defraud AJC.

57.     Rather than disbursing AJC's payments to Westwood One as obligated under the parties' agreement, Defendants retained the funds intended for Westwood One for their own use and benefit.

58.     Defendants earned these substantial financial benefits at the expense of AJC and cannot justly retain these sums.

59.    Equity and good conscience requires full restitution of the monies received by Defendants from AJC for the intended payment of AJC's media buys through Westwood One. Those monies amount to not less than $351,280, for which AJC should have judgment.

### COUNT SIX
### AGAINST TSM AND BERMAN

### Money Had and Received

60.    AJC repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth fully herein.

61.    Defendants have unjustly benefited through the receipt of money from AJC in the form of advanced payments for radio media buys intended to be disbursed by Defendants to Westwood One.  These funds were the property of AJC for which Defendants did not adequately compensate AJC or provide value; Defendants acquired these funds only as result of perpetuating and participating in a scheme to defraud AJC.

62.    Rather than disbursing AJC's payments to Westwood One as obligated under the parties' agreement, Defendants retained the funds intended for Westwood One for their own use and benefit.

63.    Defendants earned these substantial financial benefits at the expense of AJC and cannot justly retain these sums.

64.    Equity and good conscience requires full restitution of the monies received by Defendants from AJC for the intended payment of AJC's media buys through Westwood One. Those monies amount to not less than $351,280, for which AJC should have judgment.

## COUNT SEVEN
## AGAINST TSM AND BERMAN

### Constructive Trust

65.     AJC repeats and realleges each and every allegation contained in the preceding

paragraphs as if set forth fully herein.

66.     As set forth above, the assets of AJC have been unlawfully diverted as a result of

Defendants' wrongdoing for their own interests and enrichment.

67.     AJC has no adequate remedy at law.

68.     Because of the past unjust enrichment of Defendants, AJC is entitled to the

imposition of a constructive trust with respect to AJC's funds, as well as any profits received by

Defendants in the past or on a going forward basis in connection with AJC.

## COUNT EIGHT
## AGAINST TSM AND BERMAN

### Accounting

69.     AJC repeats and realleges each and every allegation contained in the preceding

paragraphs as if set forth fully herein.

70.     As set forth above, the assets of AJC have been unlawfully diverted as a result of

Defendants' wrongdoing for their own interests and enrichment.

71.     AJC has no adequate remedy at law.

72.     To determine the just compensation to AJC for the amount of monies Defendants

diverted from AJC for their own benefit, it is necessary for Defendants to provide an accounting

of any transfer of funds received from AJC, as well as to any profits received by Defendants in

the past and on a going forward basis in connection with AJC.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff AJC prays for judgment against Defendants for:

a)      compensatory damages to AJC in an amount not now known, but believed to be not less than $351,280;

b)      because their foregoing misconduct was intentional, malicious, willful and wanton, punitive damages in an amount to be determined at trial;

c)      its costs, fees, and other expenses; and

d)      any other and further relief the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: New York, New York
      July 30, 2015

**DEWEY PEGNO & KRAMARSKY LLP**

By: /s/ David S. Pegno
David S. Pegno
David C. Marden
777 Third Avenue – 37th Floor
New York, New York 10017
Telephone: (212) 943-9000
Facsimile:  (212) 943-4325
E-mail:  dpegno@dpklaw.com
        dmarden@dpklaw.com

*Attorneys for Plaintiff American Jewish Committee*