```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  6/15/16
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
AMERICAN JEWISH COMMITTEE,                 :
                                            :        **REPORT AND**
                        Plaintiff,          :        **RECOMMENDATION**
                                            :
        -v.-                                 :        15-CV-5983 (LAK) (JLC)
                                            :
JAY BERMAN and TIME & SPACE MEDIA,          :
INC.,                                       :
                                            :
                        Defendants.         :
-----------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

On November 3, 2015, the Court entered a default judgment in favor of

Plaintiff American Jewish Committee ("AJC") against Defendants Jay Berman

("Berman") and Time & Space Media, Inc. ("TSM") and referred this matter to me to

conduct an inquest into damages. (Dkt. Nos. 20, 22). For the reasons stated below,

I recommend that the Court enter judgment for AJC against Berman and TSM in

the amount of $351,280 in compensatory damages for AJC's breach of contract claim

against Defendants, without prejudice to renewal of AJC's request for an additional

$124,920.90 in compensatory damages upon submission of sufficient documentation.

I further recommend that the Court deny AJC's requests for $20,746.24 in

commission fees that it paid to TSM and $19,111.59 in pre-judgment interest.

## I.    BACKGROUND

AJC commenced this action on July 30, 2015 and named Berman and TSM as

Defendants. Complaint, dated July 30, 2015 ("Compl.") (Dkt. No. 1). AJC, a New

1

York nonprofit advocacy organization, alleged that Berman, acting through TSM, an Illinois corporation, engaged in a fraudulent scheme to misappropriate monies from AJC under the guise of facilitating the purchase of radio advertising spots for AJC's advocacy messages. *Id.* ¶¶ 1-2. In this diversity action, AJC alleged breach of contract, fraud, breach of fiduciary duty, conversion, unjust enrichment, money had and received, constructive trust, and accounting. *Id.* ¶¶ 29-72. AJC's inquest papers seek an award of compensatory damages solely based on its breach of contract claim. Plaintiff's Proposed Findings of Fact and Conclusions of Law for Damages Inquest, dated December 23, 2015 ("Pl.'s Mem."), at 9 (Dkt. No. 24).

### A. Procedural History

In its complaint, AJC sought the following relief: 1) "compensatory damages . . . in an amount not now known, but believed to be not less than $351,280;" 2) "punitive damages in an amount to be determined at trial;" 3) AJC's "costs, fees, and other expenses;" and 4) "any other and further relief the Court deems just and proper." Compl., at 16. Berman and TSM were served with the summons and complaint in this action in August 2015. (Dkt. Nos. 7-10).

On October 5, 2015, AJC sought entry of default against Berman and TSM for failure to respond to the complaint. (Dkt. No. 13). The defaults were noted pursuant to Rule 55(a) by the Clerk of the Court on the same date. (Dkt. No. 16). On November 3, 2015, the Court entered an Order of Default Judgment. (Dkt. No. 20). The Court referred this case for an inquest into damages on November 25, 2015. (Dkt. No. 22).

2

AJC thereafter filed proposed findings of fact and conclusions of law, as well as both an affirmation and an affidavit in support of its application. Pl.'s Mem.; Affidavit of Marc D. Stern, dated December 23, 2015 ("Stern Aff.") (Dkt. No. 25); Affirmation of David C. Marden, dated December 23, 2015 ("Marden Aff.") (Dkt. No. 26). Neither Berman nor TSM have responded to AJC's submissions.

AJC's inquest submissions seek a total of $515,958.73 in compensatory damages against defendants. *Id.* This includes 1) $351,280 in funds AJC paid Defendants but that the radio network Westwood One reported as owed and overdue for radio spots that already ran; 2) $124,820.90 in funds that AJC advanced to TSM for intended radio spots on Westwood One that never ran; 3) $20,746.24 in commission fees that AJC paid defendants in connection with the Westwood One media buys; and 4) $19,111.59 in pre-judgment interest. *Id.*

## B. Factual Background

As a result of Berman and TSM's default, the Court accepts as true all of the well-pled factual allegations of the complaint, except those relating to damages. *See, e.g., Finkel v. Romanowicz,* 577 F.3d 79, 84 (2d Cir. 2009); *Cotton v. Slone,* 4 F.3d 176, 181 (2d Cir. 1993); *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir. 1992). AJC "bears the burden of establishing [its] entitlement to recovery and thus must substantiate [its] claim with evidence to prove the extent of [its] damages." *Dunn v. Advanced Credit Recovery Inc.,* No. 11-CV-4023 (PAE) (JLC), 2012 WL 676350, at *2 (S.D.N.Y. Mar. 1, 2012) (citing *Greyhound Exhibitgroup,* 973 F.2d at 158), *adopted by* 2012 WL 1114335 (S.D.N.Y.

3

Apr. 3, 2012). AJC is entitled to all reasonable inferences that can be made from the evidence that is presented in support of its damages claims. *See, e.g., Au Bon Pain Corp. v. Artect, Inc., et al.,* 653 F.2d 61, 65 (2d Cir. 1981).

### 1. Facts Drawn from AJC's Complaint and Supported by Submitted Evidence

The following facts, which are drawn from the Court's review of AJC's complaint and supported by AJC's submissions regarding the Defendants' default and this inquest, are deemed established for the purpose of determining the damages to which AJC is entitled.

AJC is a nonprofit advocacy organization whose stated mission is to "enhance the peace and security of Israel and the Jewish people, and to advance human rights and democratic values in the United States and worldwide." Compl. ¶ 10. AJC has established a media presence to generate awareness and provide resources that promote the organization's advocacy agenda. *Id.* ¶ 11.

In November 2013, AJC retained TSM to purchase radio time on its behalf for advocacy spots that would begin to run in January 2014. *Id.* ¶ 13. Under this agreement, TSM would handle all aspects of placing the radio spots, including placements with Westwood One – one of the largest radio networks in the United States – and other providers in markets that Westwood One did not service. *Id.* All invoices for this radio time were to be sent directly to TSM, which would pay the media vendors with funds that had been advanced to it by AJC. *Id.* TSM was to receive a fee for providing this service. *Id.*

4

Pursuant to this agreement, TSM contracted with Westwood One to purchase radio spots on AJC's behalf. *Id.* ¶ 14. TSM periodically invoiced AJC for the cost of these radio spots as well as TSM's fees for their placement. *Id.* On November 20, 2014, Berman represented to AJC that TSM had secured a rate from Westwood One that was "the lowest . . . of any advertising in the country" but that Westwood One would only honor these rates for radio spots if they were purchased directly through TSM and paid for months in advance of the spots being aired. *Id.* ¶ 15. Accordingly, AJC timely paid TSM's invoices with the understanding and expectation that the funds it advanced would be used to pay Westwood One, which sent separate invoices directly to TSM. *Id.* ¶ 16.

AJC's advances to TSM included eight payments made from June 2014 to June 2015. *Id.* ¶18; Stern Aff. Ex. A at 1-2.[1] These payments corresponded to invoices from TSM that charged AJC for radio spots scheduled to run on Westwood One from September 2014 through December 2015. Compl. ¶ 18; Stern Aff. Ex. B at 5-9, 11-13. Specifically, AJC paid TSM for the entire 2015 calendar year of Westwood One radio spots in advance payments dated from November 5, 2014 through July 9, 2015. Compl. ¶ 18; Stern Aff. Ex. A.

On or about July 15, 2015, a Westwood One representative informed AJC that TSM had failed to pay the full balance for the radio spots that ran from October 2014 through June 2015. Compl. ¶ 19. Westwood One reported the

---

[1] All citations to page numbers of documents on the court's docket refer to the page numbers assigned by the Electronic Case Files ("ECF") system.

5

outstanding balance as $351,280. *Id.* Westwood One later provided a payment schedule indicating the debt associated with AJC's account and listed deficits for invoices dating from October 26, 2014 through June 28, 2015. Stern Aff. Ex. D.

The Westwood One representative also told AJC that, when it contacted TSM about the deficient payments, Berman stated that the payments were late because AJC had not paid TSM. Compl. ¶ 21. In fact, AJC had advanced funds for the purpose of paying Westwood One, but Berman and TSM had retained the money. *Id.* ¶ 20. Defendants continued to charge AJC for future radio time despite the growing deficit for radio spots that had already run. *Id.*

### 2. Additional Factual Assertions and Allegations from AJC's Inquest Submissions

The facts described above were pled in AJC's complaint and supported by documentation from its inquest submissions. However, AJC's inquest submissions presented a number of new facts and allegations in support of the damages sought.

In these submissions, AJC asserts that Berman and TSM typically would bill AJC two to five months before the air dates of the Westwood One spots, instead of upon receipt of Westwood One's invoices. Pl.'s Mem. at 4; Stern Aff. ¶ 10. From January to October 2014, Defendants paid Westwood One as they were contractually obligated to do, forwarding it the money that AJC had advanced. Pl.'s Mem. at 4; Stern Aff. ¶ 8. In October 2014, Defendants began making insufficient payments to Westwood One. Pl.'s Mem. at 4; Stern Aff. ¶ 9. Despite these deficient payments, Westwood One nevertheless continued to broadcast AJC's messages until July 2015. Pl.'s Mem. at 5; Stern Aff. ¶ 11. However, in July 2015, Westwood One

6

contacted AJC and informed it that it was in arrears for unpaid invoices and that, consequently, no further broadcasts would run until AJC paid its debt, which totaled $351,280. Pl.'s Mem. at 5; Stern Aff. ¶ 12.

AJC also asserts that, in addition to the $351,280 that it paid to Defendants for radio spots that Westwood One had already aired at the time of AJC's complaint, AJC had forwarded Defendants $124,820.90 for spots scheduled from July 2015 through the remainder of 2015. Pl.'s Mem. at 5; Stern Aff. ¶ 13. AJC states that Defendants never paid these funds to Westwood One or returned them to AJC. Pl.'s Mem. at 6; Stern Aff. ¶ 13. Westwood One has refused responsibility for these advances. Pl.'s Mem. at 6; Stern Aff. ¶ 14. AJC thus claims total damages of $476,100.90 in payments for Westwood One radio spots that Defendants retained. Pl.'s Mem. at 6; Stern Aff. ¶ 10.

Finally, AJC asserts that Berman charged commission fees for the intended media purchases, which were unearned because Defendants simply retained AJC's payments for their own benefit. Pl.'s Mem. at 6; Stern Aff. ¶ 15. AJC argues that it is entitled to damages of $20,746.24 in commission payments that were listed in TSM invoices dated November 17, 2014, February 2, 2015, May 5, 2015, and June 28, 2015. Pl.'s Mem. at 6; Stern Aff. ¶ 15, Ex. B at 9, 11-13.[2]

---

[2] AJC also argues in its inquest submissions that it is entitled to pre-judgment interest as a matter of right. Pl.'s Mem. at 8.

## II.   DISCUSSION

### A. Legal Standards

"Even when a default judgment is warranted based on a party's failure to

defend, the allegations in the complaint with respect to the amount of the damages

are not deemed true. The district court must instead conduct an inquiry in order to

ascertain the amount of damages with reasonable certainty." *Credit Lyonnais Sec.*

*(USA), Inc. v. Alcantara,* 183 F.3d 151, 155 (2d Cir. 1999). A plaintiff "bears the

burden of establishing [its] entitlement to recovery and thus must substantiate [its]

claim with evidence to prove the extent of [its] damages." *Dunn*, 2012 WL 676350,

at *2 (citing *Greyhound Exhibitgroup,* 973 F.2d at 158). To establish damages upon

default, a plaintiff must demonstrate that the "compensation sought relate[s] to the

damages that naturally flow from the injuries pleaded." *Greyhound Exhibitgroup,*

973 F.2d at 159; *Laboratorios Rivas, SRL v. Ugly & Beauty, Inc.*, No. 11-CV-5980

(RA) (JLC), 2013 WL 5977440, at *5 (S.D.N.Y. Nov. 12, 2013), *adopted by* 2014 WL

112397 (S.D.N.Y. Jan. 8, 2014); *Curves Int'l Inc. v. Negron,* No. 11-CV-2986 (ADS)

(GRB), 2012 WL 4490542, at *3 (E.D.N.Y. Aug. 31, 2012), *adopted by* 2012 WL

4490553 (E.D.N.Y. Sept. 28, 2012).

"In determining damages not susceptible to simple mathematical calculation,

Federal Rule of Civil Procedure 55(b)(2) gives courts discretion to determine

whether an evidentiary hearing is necessary or whether to rely on detailed

affidavits or documentary evidence." *Laboratorios Rivas, SRL*, 2013 WL 5977440,

at *5 (citations omitted). "Even in the absence of a hearing, however, the district

8

court cannot simply rely on the Plaintiff's statement of damages; there must be a basis upon which the court may establish damages with reasonable certainty." *House v. Kent Worldwide Mach. Works, Inc.,* 359 F. App'x 206, 207 (2d Cir. 2010) (citing *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 111 (2d Cir. 1997)). "[Courts] have interpreted this to mean that, even when the defendant defaults and is not present to object, damages must be based on admissible evidence." *Id.* (citations omitted). Here, a hearing is not necessary, as documents submitted in this action provide a "sufficient basis from which to evaluate the fairness" of the damages requested. *Fustok v. ContiCommodity Servs. Inc.,* 873 F.2d 38, 40 (2d Cir. 1989).

Under Rule 54(c), a "default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." The Second Circuit has explained that the theory behind this rule

> is that the defending party should be able to decide on the basis of the relief requested in the original pleading whether to expend the time, effort, and money necessary to defend the action. It would be fundamentally unfair to have the complaint lead defendant to believe that only a certain type and dimension of relief was being sought and then, should defendant attempt to limit the scope and size of the potential judgment by not appearing or otherwise defaulting, allow the court to give a different type of relief or a larger damage award.

*Silge v. Merz,* 510 F.3d 157, 159 (2d Cir. 2007) (quoting 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2663 (3d ed. 1998)). Accordingly, "[n]otice of the damages sought must 'come *before* the decision to default and be evident from the face of the complaint.'" *Pauta v. Aena Mech. Corp.,* No. 11-CV-6374 (WHP), 2014 WL 3855025, at *1 (S.D.N.Y. July 25, 2014)

9

(quoting *Silge*, 510 F.3d at 161). "'Notice that comes at the inquest stage' is not sufficient in itself to satisfy the notice requirement of Rule 54(c) and to 'permit a plaintiff in a default action to recover for damages not claimed in the complaint.'" *Grand Fia Inc. v. Hakakin*, No. 11-CV-2578 (PGG) (KNF), 2012 WL 3578175, at *5 (S.D.N.Y. Aug. 13, 2012) (quoting *Silge*, 510 F.3d at 161) (adopted, Order dated Dec. 28, 2012).

However, "this does not mean that Rule 54(c) precludes damages where a complaint fails to articulate a sum certain." *Pauta*, 2014 WL 3855025, at *1. Instead, "courts may award damages in the absence of an ad damnum clause articulating a sum certain, so long as those damages do not depart from the type of relief sought in the complaint." *Id.* (citing *Braccia v. D'Blass Corp.*, No. 08-CV-08927 (LTS) (KNF), 2011 WL 2848146, at *6 (S.D.N.Y. June 13, 2011) (citing *Ames v. STAT Fire Suppression, Inc.*, 227 F.R.D. 361, 362 (E.D.N.Y. 2005); *Carrasco v. W. Vill. Ritz Corp.*, No. 11-CV-7843 (DLC), 2012 WL 3822238, at *1-2 (S.D.N.Y. Sept. 4, 2012)). Courts have found that, in cases where "a specific sum cannot be provided," such as where the damages are pending, Rule 54(c) is satisfied where "the claimant has provided all the information that it has" and the damages sought at the time of the inquest do not differ in type from those sought in the complaint and flow from the injuries pleaded. *Quantum Corp. Funding, Ltd. v. Westwood Design/Build Inc.*, No. 08-CV-539 (LAK) (HBP), 2010 WL 5185072, at *9 (S.D.N.Y. Nov. 19, 2010), adopted by 2010 WL 5222120 (S.D.N.Y. Dec. 21, 2010); *see also Ames*, 227 F.R.D. at 362 ("In this case, the rule does not preclude an award of damages that accrued

10

during the pendency of the action because such damages were explicitly requested in the complaint, and sufficiently established by the affidavits submitted by plaintiffs."); *Fustok v. ContiCommodity Servs., Inc.*, 122 F.R.D. 151, 157 (S.D.N.Y. 1988), *aff'd* 873 F.2d 38 (2d Cir. 1989).

In its inquest papers, AJC "requests entry of a final judgment awarding compensatory damages on its breach of contract claim against Defendants" and does not base its claimed damages on any other cause of action in its complaint. Pl.'s Mem. at 9. "Under New York law, a successful plaintiff in a breach of contract action is entitled to damages in the 'amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract.'" *Scholastic, Inc. v. Snap TV, Inc.*, No. 09-CV-4349 (GBD) (GWG), 2011 WL 1330246, at *3 (S.D.N.Y. Apr. 8, 2011) (quoting *Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 495 (2d Cir. 1995)), *adopted by* 2012 WL 3041786 (S.D.N.Y. Jul. 23, 2012); *accord Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.,* 500 F.3d 171, 185 (2d Cir. 2007) ("A party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms.").

### B. Application of Legal Standards to Compensatory Damages Claim

In its inquest submissions, AJC "requests entry of a final judgment awarding compensatory damages on its breach of contract claim against Defendants in the total amount of $515,958.73." Pl.'s Mem. at 9. This total figure consists of 1) $351,280 in funds that AJC paid Defendants for radio spots that Westwood One ran

from October 2014 through June 2015, before AJC filed its complaint; 2)

$124,820.90 in funds that AJC advanced to Defendants for radio spots it intended to

run on Westwood One in July through December 2015 but that never ran; 3)

$20,746.24 in commission fees that AJC paid Defendants in connection with the

Westwood One media buys; and 4) $19,111.59 in pre-judgment interest. *Id.* For the

reasons discussed below, the Court recommends a damages award of only $351,280

for the first category of relief because the other categories sought are either

insufficiently supported by AJC's inquest submissions or are different in kind from

the damages pled in AJC's complaint.

### 1. Payments for Radio Spots that Westwood One Ran from October 2014 through June 2015, Before AJC Filed its Complaint

AJC seeks compensatory damages of $351,280 in funds paid to Defendants

for the purchase of Westwood One radio spots that ran from October 2014 through

June 2015, but that Defendants instead kept for themselves. Pl.'s Mem. at 9. In its

complaint and specifically in its breach of contract claim, AJC repeatedly asserted

damages of "not less than $351,280." *See, e.g.,* Compl. ¶ 34. AJC has submitted the

following documents in support of this claim: invoices that TSM sent to AJC,

requesting payment to purchase radio spots from Westwood One; AJC's invoice

history report from January 1, 2014 to July 31, 2015, listing the payments it made

to TSM; and a payment schedule that Westwood One provided to AJC, which shows

the amounts that remained due on its account as of August 2015. Stern Aff. Exs. B,

A, D.

The invoices that AJC received from TSM demonstrate that, in addition to fees for TSM's services and the cost of radio spots to be purchased from other providers, from June 11, 2014 through June 28, 2015, TSM charged AJC a total of $571,965 as the net cost for radio spots to be run on Westwood One from September 2014 through December 2015.[3] Stern Aff. Ex. B. Specifically, TSM charged AJC $84,150 on June 11, 2014 for radio spots in September and October 2014; $74,800 on July 16, 2014 for radio spots in November and December 2014; $86,445 on October 30, 2014 for radio spots in January and February 2015; $86,445 on November 17, 2014 for radio spots in March and April 2015; $76,840 on February 2, 2015 for radio spots in May and June 2015; $86,445 on May 5, 2015 for radio spots in July, August, September, and October 2015; and $76,840 on June 28, 2015 for radio spots in November and December 2015. *Id.* at 5-6, 8-9, 11-13.

AJC's invoice history report from January 1, 2014 to July 31, 2015 indicates that it paid TSM the full amounts quoted in TSM's invoices. Stern Aff. Ex. A. The invoice history report sets out the intended dates for the purchased radio spots, and the payments correspond to the charges listed on TSM's invoices for these dates.[4]

Finally, AJC submitted a payment schedule from Westwood One. Stern Aff. Ex. D. While it is not clear from the face of the document whether Westwood One is

---

[3] This number was calculated by adding the amounts charged to AJC for radio spots on Westwood One, as listed in the invoices from June 11, 2014 through June 28, 2015. Stern Aff. Ex. B.

[4] The recorded payments and invoices include the amounts due for Westwood One radio spots, advertising through other distributors, and fees for TSM's services. To arrive at the amounts charged solely for Westwood One radio spots, the Court subtracted the fees charged for TSM's services where appropriate.

its author, the General Counsel of AJC, Marc Stern, Esq., has sworn that Westwood
One provided the payment schedule after it informed AJC that its account was in
arrears. Stern Aff. ¶ 12. This document indicates that, despite the payments AJC
made to TSM, an outstanding balance of $351,280 remained for the media
purchases made on AJC's behalf. Compl. ¶ 19; Stern Aff. Ex. D. The recorded
deficiencies in payment corresponded to radio spots that ran on Westwood One from
October 2014 through June 2015. Compl. ¶ 19. The payment schedule lists the
dates the payments were due, which span October 2014 through June 2015. Stern
Aff. Ex. D. While the deficient payments fail to correspond precisely to TSM's
invoices to AJC, AJC explains that this failure results from TSM and Westwood
One having submitted their invoices on different dates and the fact that TSM's
payments were partial and irregular. Stern Aff. ¶ 10. The Court credits this
explanation.

Moreover, the Court finds that AJC has pled that, by contract, the
responsibility for facilitating the purchase of radio spots with Westwood One
(including the collection of sufficient funds from AJC and their payment to
Westwood One) lay solely with TSM, and AJC adequately demonstrated that it
timely provided TSM with the funds it requested for spots in October 2014 through
June 2015. Nevertheless, AJC received notice from Westwood One that TSM had
failed to pay for these same spots, resulting in a debt of $351,280. Accordingly, the
Court recommends that AJC be awarded compensatory damages of $351,280, which

constitutes the funds it advanced to Defendants for the intended purchase of radio spots that ran on Westwood One from October 2014 through June 2015.

### 2. Funds Advanced to Defendants for Radio Spots Intended to Run from July through December 2015, After AJC Filed its Complaint

AJC also seeks, as compensatory damages arising out of its breach of contract claim against Defendants, $124,820.90 in funds that AJC advanced to Defendants for radio spots from July 2015 through December 2015, which never ran. In its complaint, AJC did not itemize any other monetary damages beyond its claim of "not less than $351,280" for the debt owed to Westwood One. Compl. ¶¶ 19, 34. Only now in its inquest submissions does AJC notify the Court and Defendants that it seeks this additional amount of $124,820.90. *See* Pl. Mem. at 9; Stern Aff. 3.

Though Rule 54(c) provides that a "default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings," damages may still be awarded when a complaint does not allege a sum certain, the damages requested were pending (and thus unknowable) at the pleading stage, and the damages sought at the time of the inquest do not differ in type from those alleged in the complaint and flow from the injuries pled. *Pauta*, 2014 WL 3855025, at *1; *Quantum Corp. Funding, Ltd.*, 2010 WL 5185072, at *9. A plaintiff will nevertheless "bear[] the burden of establishing [its] entitlement to recovery and thus must substantiate [its] claim with evidence to prove the extent of [its] damages." *Dunn*, 2012 WL 676350, at *2 (citing *Greyhound Exhibitgroup*, 973 F.2d at 158). Accordingly, "there must be a basis upon which the court may establish damages with reasonable certainty . . .

15

damages must be based on admissible evidence." *House*, 359 F. App'x at 207 (citations omitted).

Here, AJC pled that it paid TSM advances for the purchase of radio spots with Westwood One and did so in installments dated June 2014 through July 2015. Compl. ¶ 18. TSM's invoices indicate that these payments corresponded to charges for radio spots scheduled for September 2014 through December 2015. *Id*; Stern. Aff. Ex. B. The payments and corresponding charges total $645,512.90. Compl. ¶18; Stern. Aff. Ex. B. AJC also pled that, in July 2015, Westwood One notified AJC that its account held a $351,280 debt because TSM had failed to make full payments for the radio spots that ran from October 2014 through June 2015. Compl. ¶ 19. At the time of this discovery, AJC had already paid TSM for radio spots scheduled for July through December 2015.[5] Compl. ¶ 19; Stern Aff. Ex. A. Thus, at the time AJC filed its complaint on July 30, 2015, AJC likely could not have known whether TSM would pay Westwood One for the radio spots scheduled for the remainder of that year or, alternatively, return the advanced funds to AJC.

Consequently, it appears that AJC's current claim for an additional $124,820.90 was unknown at the time the complaint was filed, is of the same type as the damages pled therein (compensation for Defendants' breach of contract), and flows from the injuries pled (TSM's retention of AJC's advanced payments through June 2015). It is also likely that AJC provided all the information that was known

---

[5] The payments for these radio spots correspond to TSM invoices dated November 2014 to June 2015. Stern Aff. Exs. A, B.

16

and available at the time it filed its complaint. If this was the case, AJC's claim for

the additional $124,820.90 in damages should not be precluded even though

Defendants did not have notice of this specific amount from the complaint.

However, AJC still "bears the burden of establishing [its] entitlement to

recovery . . . with evidence to prove the extent of [its] damages." *Dunn,* 2012 WL

676350, at *2. AJC has failed to submit sufficient documentation to substantiate its

request for $124,820.90.

In its inquest submissions, AJC states that it advanced TSM a total of

$476,122.90 in payments it made from November 2014 through July 2015. Pl.'s

Mem. at 4; Stern Aff. ¶ 10, Ex. C. AJC contends that TSM misappropriated the

entirety of these payments, which should have gone to Westwood One. Pl. Mem. at

5-6; Stern Aff. ¶ 10. AJC argues that, after the $351,280 deficit that Westwood One

reported in July, TSM retained an additional $124,820.90 in advanced payments

that TSM never paid to Westwood One or returned to AJC.[6] Pl.'s Mem. at 5.

On close examination, however, this $124,820.90 figure fails to match up with

either the facts pled in AJC's complaint or the documentation provided in AJC's

inquest submissions. First, the November 2014 through July 2015 payments, which

---

[6] The Court notes that the sum of $351,280 and $124,820.90 equals $476,100.90
(which is 22 dollars less than the claimed total of $476,122.90). The Court assumes
that AJC's assertion of a total loss of $476,122.90 in advance payments is the result
of a miscalculation of these numbers. However, because the Court declines to grant
AJC's request for $124,820.90 due to a number of additional discrepancies with the
amount of damages requested and the lack of supporting documentary evidence, it
will not address this miscalculation issue here but instead directs AJC to address
this issue in any further submissions in support of its request for $124,820.90 in
additional damages.

17

AJC's inquest submissions describe as encompassing the total amount of damages, only correspond to the invoices TSM issued in October 2014 through June 2015, which in turn were earmarked for radio spots scheduled in January 2015 through December 2015. Stern Aff. Exs. A, B at 8-9, 11-13. Yet, according to AJC's complaint, Westwood One reported a deficit in payments that corresponded to spots scheduled months earlier, starting in October 2014. Compl. ¶ 19; *see* Stern Aff. Ex. B at 5-7. Second, a review of the invoices to which AJC's November 2014 through July 2015 payments are responsive indicates that they include charges for radio spots with providers other than Westwood One as well as fees to TSM. *See id.* Exs. A, B at 8-9, 11-13. Records of payments that AJC made to TSM therefore cannot be an accurate measure of the damages that flow from TSM's failure to pay only Westwood One. Finally, while TSM's invoices and AJC's invoice history report indicate that AJC was indeed charged and paid for radio spots scheduled from July 2015 through December 2015, the charges listed for the Westwood One spots ($86,445 in May 2015 for spots in July 2015 through October 2015, and $76,840 in June 2015 for spots in November and December 2015) amount to $163,285, which is significantly more than the $124,820.90 sought by AJC. *See id.* Exs. A, B at 12-13.

AJC contends that it is "difficult to reconcile bills exactly, as Westwood One and TSM used different dates on invoices and because partial payments were made only irregularly." Stern Aff. ¶ 10. Yet this does not relieve AJC of its burden to provide the Court with evidence that will allow it to ascertain damages with reasonable certainty. While the Court credited this characterization of the

competing invoices when there was independent evidence of the $351,280 that was owed to Westwood One, there is not similar evidence here. AJC may well have suffered additional damages that flow from TSM's breach of its contract to pay Westwood One for radio spots scheduled after June 2015, but it is impossible to anchor AJC's additional claims in the present record.

Accordingly, the Court recommends that AJC's request for $124,820.90 be denied without prejudice to renewal upon submission of sufficient documentation to justify this additional claim for damages. Specifically, AJC should submit any documentation of demands from Westwood One that AJC pay for the radio spots scheduled after June 2015, or any other records that Westwood One may have kept of AJC's failure to pay for these spots. AJC should also account for any discrepancies between records of debt to Westwood One and the documentation of AJC's payments to TSM.

### 3. Commission Fees that AJC Paid Defendants

AJC also seeks to recover commission fees in the amount of $20,746.24 that Berman charged for his services in procuring radio spots on Westwood One, arguing that these fees were unearned because Defendants retained AJC's payments for their own benefit. Pl.'s Mem. 6; Stern Aff. ¶ 15. AJC contends that it is entitled to recover the commission payments listed in TSM invoices dated November 17, 2014, February 2, 2015, May 5, 2015, and June 28, 2015. Pl.'s Mem. at 6; Stern Aff. ¶ 15, Ex. B at 9, 11-13. However, the Court finds that these damages differ in kind from the compensatory damages that AJC sought in its breach of contract claim and,

19

moreover, are not adequately pled in the complaint. The Court therefore recommends that AJC's claim of damages in the amount of $20,746.24 in commission payments be denied.

AJC's complaint characterized the nature of this action as one arising from "Defendants' fraudulent scheme to misappropriate monies from AJC . . . [u]nder the guise of providing media buying services for advocacy spots" on radio programs, in which "[r]ather than remitting those payments to a media vendor, as contractually mandated under the parties' agreement, Berman instead surreptitiously retained AJC's payments totaling approximately $350,000." Compl. ¶ 1-2. The complaint outlines a contractual agreement between AJC and Defendants in which TSM would purchase radio spots with Westwood One, TSM would pay Westwood One directly using funds advanced by AJC, and TSM would receive a fee for these media buying services. *Id.* ¶ 13. However, TSM did not honor this agreement and instead began retaining payments from AJC, resulting in a $351,280 deficit in AJC's account with Westwood One by the time AJC filed its complaint on July 30, 2015. *Id.* ¶ 19. AJC's complaint accordingly requested "compensatory damages to AJC in an amount not now known, but believed to be not less than $351,289," along with punitive damages, AJC's costs, fees, and other expenses, and "any other and further relief the Court deems just and proper." *Id.* at 16. In AJC's submissions in support of this inquest, AJC again requested "compensatory damages on its breach of contract claim" but, for the first time, included a claim of "$20,746.24 for the monies

received by Defendants from AJC as purported commission fee payments" as part of this request. Pl.'s Mem. at 9.

As discussed above, Rule 54 is intended to ensure notice to Defendants of the relief sought against them so that they can assess the "scope and size of the potential judgment" before determining that they will not appear or otherwise default. *Silge*, 510 F.3d at 159 (citation omitted). Here, AJC's complaint made no mention of Berman's improper receipt or retention of commission fees other than by briefly noting that Defendants "received a fee" in exchange for the provision of media buying services. Compl. ¶ 13. There was no indication that this fact was included for any reason other than to support AJC's breach of contract claim for $351,290, which requires an exchange of something of value in return for a promise or service. AJC's complaint consequently provided no meaningful notice – either in its request for relief or in the facts pled – that AJC contemplated or would be seeking commission fees as part of its breach of contract claim. *See, e.g.,* *Guanghong Int'l (HK) Ltd. v. Ultimate Fin. Sols. LLC*, No. 11-CV-4019 (RMB) (KNF), 2012 WL 1228085, at *4 (S.D.N.Y. Mar. 26, 2012) (finding that damages of loss of funds from breach of contract, which plaintiff pled in its complaint, did not include commissions that plaintiff paid under the contract, which plaintiff sought in its inquest submissions, because "[n]o evidence was presented that would suggest that . . . the 'loss of use of the funds' includes the 'minimum commissions'"), *adopted by* 2012 WL 2402902 (S.D.N.Y. June 26, 2012).

Further, "a successful plaintiff in a breach of contract action is entitled to damages in the 'amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract.'" *Scholastic, Inc.,* 2011 WL 1330246, at *3 (quoting *Indu Craft, Inc.,* 47 F.3d at 495). Under the basic terms of the contract as set out in AJC's complaint, AJC would not be entitled to any of the commission fees had Berman and TSM fully performed their obligations. Therefore, even if there had been notice, any misbegotten commission fees would not be available under AJC's breach of contract claim.

Finally, even if another cause of action in AJC's complaint could be read to encompass the claimed commission fees, the facts in AJC's complaint do not sufficiently support or provide adequate notice that AJC would be seeking the commission fees as damages. *See, e.g., Campbell v. Bank of New York Trust Co.,* No. 11-CV-1588 (CS) (PED), 2012 WL 2952852, at *15 (S.D.N.Y. May 8, 2012) ("Not only does the Complaint fail to identify the[] legal theories" that would support the damages Plaintiffs seek at inquest, "but it also fails to set forth factual allegations that would support such claims. Because '[i]t is the . . . [c]omplaint, not the inquest submissions that establishes defendants' liability,' the Court may not award damages on these claims.") (quoting *Gutman v. Klein,* No. 03-CV-1570 (BMC) (RML), 2010 WL 4975593, at *10 (E.D.N.Y. Aug, 19, 2010), *adopted by* 2010 WL 4916722. at *7 (E.D.N.Y. Nov. 24.2010)), *adopted by* 2012 WL 2953967 (S.D.N.Y. July 18, 2012). At the time it filed its complaint on July 30, 2015, AJC had to have known that TSM had kept at least two of the four claimed commission fee payments

22

without providing the contracted-for media buying services; the fees in the November 17, 2014 and February 2, 2015 invoices corresponded to intended purchases of radio spots in March, April, May, and June, the same spots for which Westwood One informed AJC it was in arrears in July 2015. Nevertheless, AJC failed to explicitly demand that it be reimbursed for these commission fees anywhere in its complaint.

For all these reasons, the Court recommends that AJC's request to recoup $20,746.24 in commission payments be denied.

### 4. Pre-Judgment Interest

Finally, AJC includes $19,111.59 in pre-judgment interest in its requested compensatory damages award, calculated pursuant to the statutory rate for a breach of contract action. In its inquest papers, AJC asserts that "[a] plaintiff who prevails on a claim for breach of contract is also entitled to pre-judgment interest as a matter of right." Pl.'s Mem. at 8 (citing N.Y. C.P.L.R. § 5001(a); *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 698 (2d Cir. 1991); *Allstate Ins. Co. v. Kumar*, No. 10-CV-8166 (KBF) (RLE), 2013 WL 2395748, at *4 (S.D.N.Y. June 3, 2013)). However, AJC did not include a request for pre-judgment interest in its complaint. It only made a general demand for "any other and further relief the Court deems just and proper." Compl. at 16. The Court therefore recommends that AJC's request for pre-judgment interest be denied because it differs in kind from the damages that were demanded in the pleadings.

23

Citing the language of Rule 54 that "a default judgment 'shall not be different in kind from or exceed in amount that prayed for in the demand for judgment,' . . . the Second Circuit has held that a demand for prejudgment interest is not implied by a 'generic request for 'such other and further relief which this Court deems just and proper.''" *RLI Ins. Co. v. King Sha Grp.*, 598 F. Supp. 2d 438, 446 (S.D.N.Y. 2009) (quoting *Silge,* 510 F.3d at 160). "Rather, Rule 54(c) requires 'meaningful notice' beyond such formulaic language so that defendants can anticipate 'their exposure in the event of default.'" *Id.* Further, cases that litigants (like Plaintiff here) cite for "the proposition that prejudgment interest is mandatory [in breach of contract cases] under New York law, 'whether the prejudgment interest is alleged or not,'" will not control when damages are determined at inquest because those cases "do not involve a judgment by default and, consequently, do not implicate the notice requirement pursuant to Rule 54(c)." *Guanghong Int'l (HK) Ltd.*, 2012 WL 1228085, at *6.[7] Accordingly, AJC's request for pre-judgment interest should be denied because its complaint did not provide sufficient notice that it would seek damages of this kind.

## III.   CONCLUSION

For the foregoing reasons, I recommend that the Court award AJC compensatory damages of $351,280 for AJC's breach of contract claim against

---

[7] In addition to *U.S. Naval Institute v. Charter*, AJC cites *Allstate Ins. Co. v. Kumar* in support of its request for an award of pre-judgment interest. 2013 WL 2395748, at *4. However, *Allstate* is also inapposite because there is no evidence in that case that plaintiff failed to request pre-judgment interest in the complaint.

Defendants, without prejudice to renewal of AJC's request for an additional

$124,920.90 in compensatory damages upon submission of sufficient documentation.

I further recommend that the Court deny AJC's requests for $20,746.24 in

commission fees that AJC paid to TSM, and $19,111.59 in pre-judgment interest

because such damages are different in kind from those pled in the complaint.

## PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to

file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any

responses to such objections, shall be filed with the Clerk of Court, with courtesy

copies delivered to the chambers of the Honorable Lewis A. Kaplan and to the

chambers of the undersigned, United States Courthouse, 500 Pearl Street, New

York, New York, 10007. Any requests for an extension of time for filing objections

must be directed to Judge Kaplan. **FAILURE TO FILE OBJECTIONS WITHIN**

**FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS**

**AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S.

140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham,*

*Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010); 28 U.S.C. § 636(b)(1); Fed. R.

Civ. P. 72.

Dated:     New York, New York
           June 15, 2016

JAMES L. COTT
United States Magistrate Judge